**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 29, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

COLORADO CROSS-DISABILITY
COALITION, a Colorado non-profit
corporation; ANITA HANSEN; JULIE
FARRAR, on behalf of themselves and
all others similarly situated,

      Plaintiffs - Appellees,

and

BENJAMIN HERNANDEZ; ROBERT
SIROWITZ; JOSHUA STAPEN;
ROBIN STEPHENS,

      Plaintiffs,

v.

ABERCROMBIE & FITCH CO.;
ABERCROMBIE & FITCH STORES,
INC.; J.M. HOLLISTER LLC, d/b/a
Hollister Co.,

      Defendants - Appellants.

---------------------------

UNITED STATES OF AMERICA;
LEGAL CENTER FOR PEOPLE
WITH DISABILITIES AND OLDER
PEOPLE; AMERICAN
ASSOCIATION OF PEOPLE WITH
DISABILITIES; CENTER FOR
RIGHTS OF PARENTS WITH
DISABILITIES; DISABILITY

No. 13-1377

RIGHTS AND ADVOCATES;
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND; DISABILITY
RIGHTS LEGAL CENTER; LEGAL
AID SOCIETY– EMPLOYMENT
LAW CENTER; NATIONAL
DISABILITY RIGHTS NETWORK;
NATIONAL FEDERATION OF THE
BLIND,

     Amici Curiae.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:09-CV-02757-WYD-KMT)**

---

Mark A. Knueve (and Michael J. Ball of Vorys, Sater, Seymour and Pease, LLP, Columbus, Ohio; Gregory Alan Eurich and Joseph Neguse of Holland & Hart LLP, Denver, Colorado, on the briefs), for Defendants - Appellant.

Amy F. Robertson (and Timothy P. Fox of Civil Rights Education and Enforcement Center, Denver, Colorado; Bill Lann Lee of Lewis, Feinberg, Lee, Renaker & Jackson, PC, Oakland, California; Kevin W. Williams and Andrew C. Montoya of Colorado Cross Disability Coalition, Denver, Colorado; Julia Campins and Hillary Benham-Baker of Campins, Benham-Baker, LLP, San Francisco, California, on the brief), for Plaintiffs - Appellees.

Sasha Samberg-Champion, (Jocelyn Samuels, Acting Assistant Attorney General, and Mark L. Gross, Department of Justice, Civil Rights Division, Appellate Section, on the brief), Washington, D.C., for Amicus Curiae United States of America.

Michelle Uzeta, Monrovia, California, for Amici Curiae Legal Center for People With Disabilities and Older People, American Association of People with Disabilities, Center for Rights of Parents with Disabilities, Disability Rights Advocates, Disability Rights Education and Defense Fund, Disability Rights Legal Center, Legal Aid Society – Employment Law Center, National Disability Rights Network and National Federation of the Blind.

Before **KELLY**, **TYMKOVICH**, and **McHUGH**, Circuit Judges.

**KELLY**, Circuit Judge.

Defendants–Appellants Abercrombie & Fitch Co., Abercrombie & Fitch Stores, Inc., and J.M. Hollister LLC, d/b/a Hollister Co. (collectively, Abercrombie)[1] appeal from several orders by the district court holding that Hollister clothing stores violate the Americans with Disabilities Act (ADA). First, Abercrombie challenges the district court's holding that the Plaintiffs have Article III standing. See Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co., 957 F. Supp. 2d 1272, 1277 (D. Colo. 2013). Second, it challenges the court's certification of a nationwide class of disabled persons who shop at Hollister stores. See Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co., No. 09-cv-02757, 2012 WL 1378531, at *7 (D. Colo. 2012). Third, it challenges the court's holding that entrances at many Hollister stores violate Title III of the ADA. See Abercrombie & Fitch Co., 957 F. Supp. 2d at 1283. Finally, it challenges the court's entry of a permanent injunction remedying those violations. See Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co., No. 09-cv-02757,

---

[1] Abercrombie & Fitch Stores, Inc. and J.M. Hollister LLC are wholly owned subsidiaries of Abercrombie & Fitch Co. For simplicity, this opinion refers to the defendant entities as "Abercrombie" and the public accommodation at issue as "Hollister stores" or "Hollister."

2013 WL 6050011, at *1 (D. Colo. 2013). Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm in part, reverse in part, and remand for further proceedings.

Background

Plaintiff–Appellee Colorado Cross-Disability Coalition (CCDC) is a disability advocacy organization in Colorado. Aplee. Br. 7. It advocates on behalf of its members to promote "independence, self-reliance, and full inclusion for people with disabilities in the entire community." II Aplt. App. 486. In 2009, CCDC notified Abercrombie that Hollister stores at two malls in Colorado—Orchard Town Center and Park Meadows Mall—violated the ADA. Aplt. Br. 4-5. Initial attempts to settle the matter were unsuccessful, and this litigation followed. Id. at 4.

An ADA complaint was filed by CCDC and four of its members, one of whom was Anita Hansen. I Aplt. App. 24. Ms. Hansen, who uses a wheelchair for mobility, encountered accessibility obstacles at the Hollister at Orchard Town Center. Id. at 111. Because steps led to the store's center entrance, she attempted to enter the store through an adjacent side door, which was locked. Id. at 112. A Hollister employee let her in, but once inside, Ms. Hansen had to ask employees to move tables and furniture to get about the store. Id. This experience left her "frustrated and humiliated." Id. at 113. She had a similar experience at the Hollister at Park Meadows Mall. Id. at 114-15. The complaint alleged that these

4

barriers, including the stepped "porch-like structure" that served as the stores' center entrance, violated Title III of the ADA. Id. at 29-37. The Plaintiffs added class allegations to the complaint, challenging these barriers at "Hollister Co. stores throughout the United States." Id. at 71.

Abercrombie took it upon itself to correct some of these barriers. It modified Hollister stores by lowering sales counters, rearranging merchandise to ensure an unimpeded path of travel for customers in wheelchairs, adding additional buttons to open the adjacent side doors, and ensuring that the side doors were not blocked or locked. III Aplt. App. 782. However, one thing remained unchanged: a stepped, porch-like structure served as the center entrance at many Hollister stores.

There are two types of Hollister stores in the United States: those with center entrances that are level with the surrounding mall floor, and those like the Park Meadows Hollister[2] that feature a stepped porch as their center entrance. Aplt. Br. 5-6. These porches share a common design: the porch protrudes into the mall corridor and is covered by a terracotta roof, which gives it the look and feel

---

[2] Some Hollister stores, including the one at Orchard Town Center, have closed since the start of this case. III Aplt. App. 782-83. For much of the time that this case was proceeding before the district court, porches were present at 249 Hollister stores in the United States. See II Aplt. App. 688. When this appeal was briefed, that number was 231. See Aplt. Br. 3. The case is moot as to these closed stores; therefore, we will focus on the Park Meadows Hollister, which remains open.

5

of a Southern California surf shack.  <u>Id.</u> at 6; Aplee. Br. 4.  Two steps lead from the mall floor onto the porch—where clothed mannequins, upholstered chairs, and marketing images are displayed—and another two steps lead off the porch into either the "Dudes" (male) or "Bettys" (female) side of the store.  Aplt. Br. 5-7; Aplee. Br. 4-5.  On either side of the porch are two doors leading into the store that are level with the mall floor.  Aplt. Br. 5.  These doors are on the same storefront as the porch.  Whether a person enters the store through one of these doors, or ascends and descends the porch, that person arrives at the same point in either the Dudes or Bettys side of the store.  <u>Id.</u> at 6-7.  The following picture, depicting the raised porch in the center and the level doors to the sides, may be a helpful reference.



After the Plaintiffs filed a third amended complaint, Abercrombie moved to

dismiss arguing that the Plaintiffs lacked Article III standing. I Aplt. App. 184.

The district court denied the motion, holding that the Plaintiffs alleged a "real and

immediate threat" of future harm if the alleged ADA violations were not

remedied. Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co., No. 09-cv-

02757, 2011 WL 2173713, at *3 (D. Colo. 2011). The Plaintiffs filed a motion

for partial summary judgment, asking for judgment as a matter of law on whether

the porch at the Park Meadows Hollister violated Title III of the ADA. I Aplt.

App. 270. The Department of Justice (DOJ) filed a Statement of Interest

supporting the Plaintiffs. II Aplt. App. 346. The district court granted the

Plaintiffs' motion, holding that the "steps to the center entrance are a legally

unacceptable piece of [Hollister's] branding and violate Title III of the ADA."

Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co., 835 F. Supp. 2d. 1077,

1083 (D. Colo. 2011).

Thereafter, four of the named Plaintiffs withdrew, and Julie Farrar, another

CCDC member who uses a wheelchair, was added to join Ms. Hansen on the final

complaint. II Aplt. App. 474. On the Plaintiffs' motion, the district court

certified a class defined as

> all people with disabilities who use wheelchairs for
> mobility who, during the two years prior to the filing of
> the Complaint in this case, were denied the full and
> equal enjoyment of the goods, services, facilities,
> privileges, advantages, or accommodations of any
> Hollister Co. Store in the United States on the basis of
> disability because of the presence of an Elevated

7

Entrance.

Abercrombie & Fitch Co., 2012 WL 1378531, at * 1.

The parties filed cross motions for summary judgment. The Plaintiffs sought summary judgment on whether all Hollister stores with porches—some 249 stores nationwide—violated Title III of the ADA. II Aplt. App. 698. They also sought entry of a permanent injunction remedying this nationwide violation. Id. Abercrombie sought summary judgment on standing, arguing that the Plaintiffs failed to offer proof of a concrete injury in fact. III Aplt. App. 946-47. It also argued that the district court's earlier grant of partial summary judgment should be vacated because Abercrombie made changes to the Park Meadows Hollister addressing the court's concerns. Id. at 711. The district court granted the Plaintiffs' motion in full and denied Abercrombie's. Abercrombie & Fitch Co., 957 F. Supp. 2d at 1283-84. The court held that the Plaintiffs produced evidence of their standing and that Abercrombie's changes to the Park Meadows Hollister did not moot the claim against the porch entrance. Id. at 1277. The court then held that the porch structures at all Hollister stores violated Title III of the ADA. Id. at 1283.

Finally, the court entered a permanent injunction; it ordered Abercrombie to bring all Hollister stores with porches into compliance with Title III of the ADA within three years, at a rate of at least 77 stores per year. III Aplt. App. 1098-99. Abercrombie could do so by modifying the porches in one of three

8

ways: (1) making the porch entrance "level with the surrounding floor space"; (2) placing a ramp on the porch; or (3) closing the porch off from "any public access." Id. at 1098. Abercrombie appealed.

## Discussion

I. Standing

This court reviews standing de novo. Tandy v. City of Wichita, 380 F.3d 1277, 1283 (10th Cir. 2004). At its "irreducible constitutional minimum," standing has three elements. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). First, a plaintiff must suffer an "injury in fact" that is actual or imminent. Id. Second, the injury must be fairly traceable to the challenged action of the defendant. Id. Third, it must be likely that the injury will be redressed by the relief requested. Id. at 561. In response to a summary judgment motion, a plaintiff must support each element of standing by setting forth, through affidavit or other evidence, "'specific facts,' which for purposes of the summary judgment motion will be taken to be true." Id. (citation omitted) (quoting Fed. R. Civ. P. 56(e)).

Abercrombie contends that Ms. Hansen and Ms. Farrar have not suffered a genuine injury in fact because they are ADA testers. Aplt. Br. 19-20. This court has held, however, that "testers have standing to sue under Title II of the ADA." Tandy, 380 F.3d at 1287. We believe the same is true for Title III of the ADA.

9

See Houston v. Marod Supermarkets, Inc., 733 F.3d 1323, 1332-34 (11th Cir. 2013) (relying on Tandy and holding that testers have standing under Title III of ADA). Like Title II, Title III provides remedies for "any person" subjected to illegal disability discrimination. Compare 42 U.S.C. § 12133 (Title II), with id. § 12188(a)(1) (Title III); see also Tandy, 380 F.3d at 1286-87. Thus, anyone who has suffered an invasion of the legal interest protected by Title III may have standing, regardless of his or her motivation in encountering that invasion. However, the fact that "tester standing" exists under Title III does not displace the general requirements of standing. See Houston, 733 F.3d at 1334. Like any plaintiff, a tester must demonstrate that she has indeed suffered a cognizable injury in fact that will be redressed by the relief sought.

The "injury in fact" requirement differs "depending on whether the plaintiff seeks prospective or retrospective relief." Tandy, 380 F.3d at 1283 (citing City of Los Angeles v. Lyons, 461 U.S. 95, 101-02 (1983)). When prospective relief—such as an injunction—is sought, "the plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future." Id. In Tandy, we held that several ADA testers had standing to seek injunctive relief against the City of Wichita. Id. at 1287-89. These plaintiffs were "under a real and immediate threat of experiencing a lift malfunction" on the city's buses because they averred in affidavits an intent "to test Wichita Transit's

10

fixed-route services several times per year." Id. at 1287.[3] We held that "testimony of an intent to use buses 'several times per year' suggests a concrete, present plan to use" the buses "several times each year, including the year in which [the plaintiff] made that statement." Id. at 1284; see also id. at 1285 n.12. This contrasted with the plaintiffs in Lujan v. Defenders of Wildlife, whom the Supreme Court held "merely expressed a desire to someday visit places halfway around the world." Id. (citing Defenders of Wildlife, 504 U.S. at 564).

With these principles in mind, we hold that Plaintiff Julie Farrar has standing to seek prospective relief. In two affidavits, Ms. Farrar averred that she "intend[s] to . . . return to" the Park Meadows Hollister, II Aplt. App. 463, and that she "will likely be going to the Park Meadows Mall at least six times per year," id. at 644. This "six times per year" testimony has the same effect as the "several times per year" testimony in Tandy. It suggests a concrete, present plan to return to the Park Meadows Hollister several times—at least six—each year, including the year in which Ms. Farrar made that statement. See Tandy, 380 F.3d at 1284.

Abercrombie challenges the plausibility of Ms. Farrar's intent to return to the Park Meadows Hollister, pointing out that she has never entered a Hollister store and that the Park Meadows Mall is not the closest to her home. Aplt. Br.

_____

[3] We held that one plaintiff lacked standing because he failed to file such an affidavit. Tandy, 380 F.3d at 1288.

11

21-22; Aplt. Reply Br. 5. For the purposes of summary judgment, however, we must take the specific facts set forth in Ms. Farrar's affidavit as true. See Defenders of Wildlife, 504 U.S. at 561. Moreover, her claim that she will return to the Park Meadows Hollister at least six times per year is not rendered implausible by the distance between the store and her home. Ms. Farrar testified that she will go to the Park Meadows Mall more often now that her friend has moved nearby. II Aplt. App. 644, 661; see Houston, 733 F.3d at 1336-37 (ADA plaintiff suffered an injury in fact because his frequent trips to his lawyer's offices took him near the defendant's store, which was more than thirty miles from his home). Ms. Farrar's testimony demonstrates that she suffers a real and imminent threat of encountering the alleged accessibility barrier at the Park Meadows Mall in the future; this injury is directly traceable to the porch at Abercrombie's store, and it is likely that a remedial injunction, if warranted, would redress this harm. Therefore, Ms. Farrar has standing to seek prospective relief.

Ms. Farrar sought prospective relief as the representative of a nationwide class. Because we hold that she has Article III standing to challenge the porch at the Park Meadows Hollister, we need not decide whether the other named Plaintiffs, i.e., Anita Hansen and CCDC, have standing to serve as class representatives. See Horne v. Flores, 557 U.S. 433, 446-47 (2009); Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264 & n.9 (1977) ("[W]e have

12

at least one individual plaintiff who has demonstrated standing . . . . Because of

the presence of this plaintiff, we need not consider whether the other individual

. . . plaintiffs have standing to maintain the suit.").  However, Abercrombie insists

that our standing analysis does not end at the Park Meadows Mall.  It argues that

Ms. Farrar lacks standing to bring a claim for nationwide injunctive relief because

she does not intend to visit every Hollister store with a porch—over 230 stores

nationwide.  Aplt. Br. 23-24.  We have no doubt that if Ms. Farrar were seeking a

nationwide injunction in her own right, then she would lack standing to challenge

accessibility barriers at stores she never intends to visit.[4]  See Scherr v. Marriot

Int'l, Inc., 703 F.3d 1069, 1075 (7th Cir. 2013) (although ADA plaintiff had

standing to challenge the design of a single hotel she intended to visit, plaintiff

lacked standing to challenge that same design at 56 other hotels she had no plans

to visit).  Although the concepts of standing and adequacy of status to maintain a

---

[4]  In this case, the district court held that the "individual named Plaintiffs have standing to bring a claim requesting nationwide injunctive relief."  Colo. Cross-Disability Coal. v. Abercrombie & Fitch, No. 09-cv-02757, 2011 WL 1930643, at *4 (D. Colo. 2011).  This holding seems superfluous, however, given that the individual Plaintiffs did not request a nationwide injunction to remedy their own injuries but rather to remedy the injuries of a nationwide class they sought to represent.  See I Aplt. App. 203 ("In any event, if [the Plaintiffs'] claims are common with and typical of those of a nationwide class, they will be entitled to represent that class which will have standing to seek a nationwide injunction."); Aplee. Br. 1 (The Plaintiffs "do not argue that the two individual plaintiffs have standing to obtain a nationwide injunction.").  The question whether nationwide injunctive relief may issue was more appropriately answered by asking whether a class seeking that relief should be certified.

13

class action appear related, they are independent criteria and must be evaluated separately. See Hassine v. Jeffes, 846 F.2d 169, 175-76 (3d Cir. 1988). The question whether an injunction may properly extend to Hollister stores nationwide is answered by asking whether Ms. Farrar may serve as a representative of a class that seeks such relief. All that is necessary to answer this question is an application of Rule 23. See DG ex rel. Stricklin v. Devaughn, 594 F.3d 1188, 1194 (10th Cir. 2010). We turn to that task next.

## II.     Class Certification

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2550 (2011) (internal quotation marks omitted). To justify departure from that rule, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Id. (quoting E. Tex. Motor Freight Sys., Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)) (internal quotation marks omitted). It is "Rule 23(a) [that] ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." Id. Rule 23(a)'s requirements are quite familiar: (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there is a question of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative

14

parties will fairly and adequately protect the interests of the class (adequacy). Fed. R. Civ. P. 23(a).

In addition to Rule 23(a), the class proponent must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b). Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013). In this case, the class was certified under Rule 23(b)(2), which requires the court to find that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

We review the standard the district court used in making its Rule 23 determination de novo, and we review the merits of that determination for an abuse of discretion. Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc., 725 F.3d 1213, 1217 (10th Cir. 2013). The district court enjoys "considerable discretion" in this area, and "we defer to the district court's certification ruling if it applies the proper Rule 23 standard and its decision falls within the bounds of rationally available choices given the facts and law involved." Devaughn, 594 F.3d at 1194 (internal quotation marks omitted).

A.    Class Standing

Before we apply Rule 23, we must address Abercrombie's repeated contention that no one, not even the class, has standing in this case. Specifically, Abercrombie argues that the class lacks standing because the Plaintiffs "never

15

established that there are actual, non-hypothetical class members who intend to patronize each of the Hollister stores." Aplt. Br. 29. That is, the Plaintiffs must offer proof of "actual members of the certified class who have standing" as to the 231 Hollister stores with a porch. Id. at 30.

We have heard this argument before. In DG ex rel. Stricklin v. Devaughn, the defendants argued that "Rule 23(a)'s commonality and typicality requirements demanded that Named Plaintiffs prove all members were [injured] or are actually exposed to an imminent threat of harm as a result of" the defendants' actions. 594 F.3d at 1197. We rejected this argument, noting that it "conflate[d] the requirements for standing, prospective injunctive relief, and class certification." Id. "First," we held, "only named plaintiffs in a class action seeking prospective injunctive relief must demonstrate standing by establishing they are suffering a continuing injury or are under an imminent threat of being injured in the future." Id. "Second, Rule 23's certification requirements neither require all class members to suffer harm or threat of immediate harm nor Named Plaintiffs to prove class members have suffered such harm." Id. at 1198.

Other authorities support the notion that class "standing" does not require individualized proof from class members. See Denney v. Deutsche Bank AG, 443 F.3d 253, 263 (2d Cir. 2006) (noting that Article III standing does "not require that each member of a class submit evidence of personal standing"); Prado-Steiman ex rel. Prado v. Bush, 221 F.3d 1266, 1279-80 (11th Cir. 2000) (Court

16

must first determine whether "at least one named class representative has Article III standing," then "question whether the named plaintiffs have representative capacity, as defined by Rule 23(a), to assert the rights of others.").  Three Justices of the Supreme Court favorably quoted this principle from a leading class action treatise:

> "[Unnamed plaintiffs] need not make any individual showing of standing [in order to obtain relief] . . . . Whether or not the named plaintiff who meets individual standing requirements may assert the rights of absent class members is neither a standing issue nor an Article III case or controversy issue but depends rather on meeting the prerequisites of Rule 23 governing class actions."

Lewis v. Casey, 518 U.S. 343, 395-96 (1996) (Souter, J., concurring) (alterations in original) (ellipses added) (quoting 1 H. Newberg & A. Conte, Newberg on Class Actions § 2.07, pp. 2-40 to 2-41 (3d ed. 1992)).  The majority seemed to agree, pointing out that its holding did "not rest upon the application of standing rules."  See id. at 360 n.7.[5]

---

[5]  Abercrombie's position could be framed as an argument that nationwide injunctive relief was inappropriate because there was no proof of nationwide injuries necessitating such relief.  See Lewis, 518 U.S. at 348-49.  In this case, however, we are faced with a nationwide design—"231 Hollister stores that have one elevated entry door with steps in addition to two adjacent, level, fully accessible entry doors."  Aplt. Br. 3.  An injunction aimed at those and only those Hollister stores fits perfectly with the claim that those stores violate class members' rights under the ADA.  Contra Lewis, 518 U.S. at 360 (absent showing of systemwide constitutional violation, injunction with systemwide scope was inappropriate).

17

Thus, the question whether this class may seek nationwide injunctive relief is not answered by demanding proof of standing from each class member but by application of Rule 23.

B.    Numerosity

"The burden is upon plaintiffs seeking to represent a class to establish that the class is so numerous as to make joinder impracticable." Peterson v. Okla. City Hous. Auth., 545 F.2d 1270, 1273 (10th Cir. 1976). "The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." Gen. Tel. Co. of the Nw., Inc. v. Equal Emp't Opportunity Comm'n, 446 U.S. 318, 330 (1980). Plaintiffs must offer "some evidence of established, ascertainable numbers constituting the class," but there is "no set formula to determine if the class is so numerous that it should be so certified." Rex v. Owens ex rel. Okla., 585 F.2d 432, 436 (10th Cir. 1978).

Abercrombie argues that the Plaintiffs failed to meet the numerosity requirement because "they presented no evidence regarding the size of their proposed class." Aplt. Br. 50. This court has said, however, that the numerosity requirement is not "a question of numbers." Horn v. Associated Wholesale Grocers, Inc., 555 F.2d 270, 275 (10th Cir. 1977). Rather, there are a several "factors that enter into the impracticability issue." Id. Such factors may "includ[e] the nature of the action, the size of the individual claims, and the location of the members of the class or the property that is the subject matter of

18

the dispute." 7A Charles Alan Wright, Arthur R. Miller & Marry Kay Kane, Federal Practice and Procedure § 1762, at 206-07 (3d ed. 2005) (footnote omitted). "[B]ecause it is such a fact-specific inquiry, we grant wide latitude to the district court in making this determination," and we defer to its determination if the court "made an appropriate judgment call." Trevizo v. Adams, 455 F.3d 1155, 1162 (10th Cir. 2006).

In this case, the district court had before it several facts that pointed to the existence of a class so numerous that joinder would be impracticable. At the time of the court's certification decision, it was undisputed that porches were present at nearly 250 Hollister stores in over 40 states. II Aplt. App. 451-58, 688. Moreover, CCDC submitted declarations from five of its members who averred that they shop at malls where Hollister stores are located. I Aplt. App. 111-28. It is undeniable, and subject to judicial notice, that there are millions of Americans with disabilities. See Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 370 (2001) (citing the congressional finding that "some 43,000,000 Americans have one or more physical or mental disabilities"). It was therefore reasonable to infer that a substantial number of disabled people live in the 40 states where Hollister stores are located; that these people, like CCDC members and many Americans, shop at malls, including the 250 malls with porched Hollisters; and that joining all of these people in one suit would be impracticable. The district court did not abuse its discretion in so finding.

19

The dissent suggests that we have weakened the evidentiary burden a class proponent faces on the numerosity element. To be sure, this class was defined only to include those who have suffered a past injury. See Abercrombie & Fitch Co., 2012 WL 1378531, at *1. But the only relief sought by this class was prospective in nature. We agree with the dissent that whether the class was defined only to include those suffering a past injury does not bar certification. As we see it, the timing of the class's injuries has little effect on the issue of impracticability: identifying, locating, and joining individuals who encounter accessibility discrimination at shopping malls in 40 states would be impracticable, regardless of whether the injury occurred in the past, is ongoing, or will occur in the future. See Penderson v. La. State Univ., 213 F.3d 858, 868 n.11 (5th Cir. 2000) ("'[J]oinder of unknown individuals is certainly impracticable,'" and "the fact that the class includes unknown, unnamed future members also weighs in favor of certification.") (first quoting Jack v. Am. Linen Supply Co., 498 F.2d 122, 124 (5th Cir. 1974)). Overturing the district court's class certification determinations would be substituting our discretion for that of the district court—something we are not empowered to do.

C.    Commonality, Typicality, and Adequacy

Abercrombie argues that the Plaintiffs failed to meet Rule 23(a)'s remaining requirements—commonality, typicality, and adequacy. Aplt. Br. 51-52. Because these requirements "tend to merge," Wal-Mart, 131 S. Ct. at 2551

20

n.5, and because Abercrombie does not address them separately, we address them together.

First, Abercrombie argues that tester plaintiffs cannot assert claims common to or typical of a class of bona fide patrons. See Aplt. Br. 51-52. This argument lacks merit. As mentioned, a plaintiff's status as tester is irrelevant in determining whether she has suffered an injury in fact under Title III of the ADA. To maintain a class action, a "class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Wal-Mart, 131 S. Ct. at 2550 (internal quotation marks omitted). The interest asserted here is the same—the right to be free from disability discrimination in a place of public accommodation—as is the alleged injury—denial of that right by porches at Hollister stores.

Elsewhere, Abercrombie again raises the specter of standing and argues that, because Ms. Farrar does not intend to visit every Hollister store with a porch, she lacks standing to obtain a nationwide injunction, and her status as class representative does not cure her lack of standing. Aplt. Br. 25. This argument conflates standing and the ability to represent a class under Rule 23. What Abercrombie challenges is whether Ms. Farrar presents "questions of law or fact common to the class" and a claim "typical of" the class when she has only visited one of the many stores against which the class seeks relief. See Fed. R. Civ. P. 23(a).

21

The commonality and typicality requirements of Rule 23(a) do not require that every member of the class share a fact situation <u>identical</u> to that of the named plaintiff. <u>Devaughn</u>, 594 F.3d at 1195; <u>see also</u> <u>Realmonte v. Reeves</u>, 169 F.3d 1280, 1285 (10th Cir. 1999). "[D]iffering fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory." <u>Adamson v. Bowen</u>, 855 F.2d 668, 676 (10th Cir. 1988). The class's "common contention 'must be of such a nature that it is capable of <u>classwide</u> <u>resolution</u>—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" <u>XTO Energy</u>, 725 F.3d at 1218 (quoting <u>Wal-Mart</u>, 131 S. Ct. at 2551).

Given this authority, it is untenable to suggest that Ms. Farrar cannot represent a class unless she shares a factually identical claim with each class member—that she visit every Hollister store that the class claims violates the ADA. Her claim against the Park Meadows Hollister is "common to" the claims of the class because it raises a common question of law—whether Hollister stores' porched entrances violate the ADA.[6] Her claim is "typical of" the class's even

---

[6] Before the district court, Abercrombie argued that class certification was inappropriate because Hollister stores utilize varying designs in their porch layout. II Aplt. App. 690, 692. On appeal, Abercrombie does not raise this issue, and we are satisfied that the porches are sufficiently similar as to pose a common question of law.

22

though she has not visited the remaining 230 stores. These claims are based on the same legal and remedial theory—that Title III of the ADA mandates injunctive relief against the porches.

These claims are capable of classwide resolution. In this regard, it is telling that Abercrombie does not challenge the district court's decision to certify the class under Rule 23(b)(2), i.e., that Abercrombie "acted or refused to act on grounds that <u>apply generally to the class</u>, so that final injunctive relief . . . is appropriate <u>respecting the class as a whole</u>." II Aplt. App. 695 (quoting Fed. R. Civ. P. 23(b)(2)) (emphasis added). The district court did not abuse its discretion in finding the requirements of Rule 23(a) and (b)(2) met, and it appropriately certified the class. We now turn to the merits of the class's ADA claim.

III. <u>ADA Violation</u>

In 1990, Congress passed the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title III of the ADA "prohibits discrimination against the disabled in the full and equal enjoyment of public accommodations." <u>Spector v. Norwegian Cruise Line Ltd.</u>, 545 U.S. 119, 128 (2005). Clothing stores, like Hollister, are public accommodations. 42 U.S.C. § 12181(7)(E). Title III provides that

> No individual shall be discriminated against on the basis
> of disability in the full and equal enjoyment of the
> goods, services, facilities, privileges, advantages, or

23

accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

Id. § 12182(a). After the ADA, all "new construction" of and alterations to public accommodations must be "accessible." Id. § 12183(a)(1), (2). That is, discrimination under § 12182(a) includes "a failure to design and construct facilities . . . that are readily accessible to and usable by individuals with disabilities." Id. § 12183(a)(1). There are statutory exemptions, e.g. id. §§ 12182(b)(1)(A)(iii), 12183(a)(1), but none of these apply here.

Congress authorized the Attorney General to promulgate regulations implementing the directives of Title III. Id. § 12186(b). Within a year of the ADA's enactment, the DOJ issued regulations based on ADA Accessibility Guidelines published by the Architectural and Transportation Barriers Compliance Board. 28 C.F.R. pt. 36. These guidelines now appear in Appendix D to 28 C.F.R. part 36, "1991 Standards for Accessible Design," or simply the "1991 Standards," id. § 36.104.

In 2010, the DOJ revised its ADA regulations. Without abrogating the 1991 Standards, the DOJ promulgated new regulations—the "2010 Standards"—that adopted newer ADA Accessibility Guidelines. See id. The 2010 Standards appear in Appendices B and D to 36 C.F.R. part 1191, and also include the requirements of subpart D of 28 C.F.R. part 36. Id. We refer to the 1991 and 2010 Standards generally as the "Design Standards."

24

The Design Standards apply in phases: Public accommodations that were newly constructed or altered after January 26, 1993, but before September 15, 2010, need only comply with the 1991 Standards. 28 C.F.R. § 36.406(a) app. Those newly constructed or altered between September 15, 2010, and March 15, 2012, have the choice of complying with either the 1991 or 2010 Standards. Id. And those newly constructed or altered after March 15, 2012, must comply with the 2010 Standards. Id. There are exceptions: Any public accommodation that is required to comply with the 1991 Standards, yet does not so comply, must "be made accessible in accordance with the 2010 Standards." Id. § 36.406(a)(5)(ii). Additionally, for public accommodations subject to the 1991 Standards,

> If the 2010 Standards reduce the technical requirements or the number of required accessible elements below the number required by the 1991 Standards, the technical requirements or the number of accessible elements in a facility subject to this part may be reduced in accordance with the requirements of the 2010 Standards.

Id. § 36.211(c).

This regulatory framework sets the stage: Because the Hollister stores at issue were constructed after January 26, 1993, but before September 15, 2010, Aplee. Br. 44, they must comply with the 1991 Standards. To the extent the stores do not comply with the 1991 Standards, they must be brought into compliance with the 2010 Standards. And to the extent the 2010 Standards "reduce the technical requirements" of the 1991 Standards, Hollister stores are

25

deemed to comply with the Design Standards so long as they meet the lower requirements of the 2010 Standards.

The district court held that the porch at Hollister stores violates Title III of the ADA in three ways. First, the court held that, regardless of any compliance with the Design Standards, Abercrombie violated the "broad statutory requirements" of the ADA. Abercrombie & Fitch Co., 835 F. Supp. 2d at 1082. Specifically, the raised porch violated the "overarching aims" of the ADA by providing a "different or separate" accommodation that was not "in the most integrated setting." Id. at 1082-83 (quoting 42 U.S.C. § 12182(b)(1)(A)(iii), (B)). Second, the court held that the porch was a "space" under the Design Standards, and because Abercrombie made that space "available to individuals who do not require wheelchairs for mobility, [it] must comply with regulations governing circulation paths and accessible routes to accessible spaces." Abercrombie & Fitch Co., 957 F. Supp. 2d at 1281. Finally, as the porch was also an "entrance" under the Design Standards, the court held that the porch violated the 1991 Standard stating that the entrance used by the "majority of people" must be accessible. Id. at 1279; see also Abercrombie & Fitch Co., 835 F. Supp. 2d at 1081-82.

We review a district court's interpretation of statutes and regulations de novo. United States v. Davis, 339 F.3d 1223, 1226 (10th Cir. 2003). We review the district court's summary judgment decisions do novo, applying the same

26

standard as the district court.  Ribeau v. Katt, 681 F.3d 1190, 1194 (10th Cir.

2012).  Because the district court held that the porches violate the ADA on three

independent grounds, we only need to find one supportable to affirm, but we must

find all wanting to reverse.  We analyze each in turn.

A.    Statutory ADA Violations

Abercrombie argues that the district court erred by holding that a facility

may violate the ADA even if it complies with the regulations regarding accessible

design.  Aplt. Br. 32-34, 47.  It argues that no court has ever found a Title III

violation based on a public accommodation's design in the absence of a violation

of the 1991 or 2010 Standards.  Id. at 33.  The Plaintiffs counter that whether the

porch violates the broad statutory guarantees of the ADA does not depend on the

porch's design but rather Abercrombie's use of that design.  Aplee. Br. 53, 57-59.

The United States, as amicus, sums up this "use" argument:

> The problem is not that wheelchair users cannot enter
> the store and access defendants' merchandise.  Rather, it
> is that defendants exclude them from a part of the store
> that defendants themselves have made a part of the
> shopping experience.  Having chosen to imbue the porch
> with such significance, the defendants cannot, as here,
> exclude individuals with disabilities from it and consign
> them to a wholly different experience.

U.S. Br. 14.  Because Abercrombie "uses" its porches as the central feature of the

"Hollister experience," this argument goes, it denies disabled customers the full

and equal enjoyment of that experience in violation of 42 U.S.C. § 12182(a).  See

27

Aplee. Br. 58.

There is a significant flaw in the Plaintiffs' argument. Apart from its existence (a byproduct of its design and construction) Abercrombie does not "use" the porch at all. It is the porch's design (as a two-stepped, elevated structure) that denies disabled persons access to the store through the center entrance; the Plaintiffs do not point to any distinct policy or practice of Abercrombie's that can be called a discriminatory "use" of that structure. See Aplee. Br. 5-6 ("Because the Raised Porch Entrance is inaccessible to shoppers who use wheelchairs, those shoppers must use doors at the mall level that are located to the side . . . ."); id. at 47 (The porches "were constructed in violation" of the ADA.); id. at 50 (The porches violated the ADA "when built."). Even the United States cannot keep this "use" argument straight: It first asserts that the "complaint is not the existence of an inaccessible entranceway but its idiosyncratic use as an integral part of the shopping experience." U.S. Br. 12. It then does an about-face and states that the "claim here is that the defendants' unnecessarily discriminatory design—which serves no functional purpose—makes wheelchair users feel unwelcome and excluded." Id. at 17-18 (emphasis added). The fact that the Plaintiffs' challenge the porch as it was built, calling it a discriminatory design, leads us to conclude that we are dealing with the design of the porch and the exclusive effect of that design. The sources the Plaintiffs cite bear out that the Design Standards are the appropriate measure of ADA liability

28

in this case.

In Antoninetti v. Chipotle Mexican Grill, Inc., the Ninth Circuit held that service counters at Chipotle restaurants violated the ADA. 643 F.3d 1165, 1174 (9th Cir. 2010). The case turned on the Design Standards, which require "equivalent facilitation" if counters do not meet certain height requirements. Id. at 1173 (quoting 1991 Standard 7.2(2)(iii)). The court held that Chipotle's "policy" of showing disabled patrons samples of food and preparing food in seating areas was not "equivalent facilitation" because it denied disabled customers the full "Chipotle experience." Id. at 1174. Chipotle's "service or policy" violated the ADA, not because of a statutory guarantee of equal experiences, but because "it did not comply with the Guidelines." Id.

In Fortyune v. Am. Multi-Cinema, Inc., the Ninth Circuit considered a movie theater's "policy concerning the use of wheelchair companion seats." 364 F.3d 1075, 1078 (9th Cir. 2004). The court noted that the Design Standards were irrelevant because, unlike "cases that involve the design of a public accommodation under the ADA," the case against the theater "concern[ed] a public accommodation's policy regarding the use of that design (e.g., the use and availability of a companion seat)." Id. at 1085. The court held that the plaintiff established an ADA claim because the theater "employed a discriminatory policy or practice." Id. (citing 42 U.S.C. § 12182(a), (b)(2)(A)(ii)).

The Design Standards are also instructive. The purpose of the standards is

29

"to effectuate title III of the Americans with Disabilities Act." 28 C.F.R. pt. 36, app. C (guidance to 28 C.F.R. § 36.101). A public accommodation that "complies with these guidelines" is deemed "accessible." 1991 Standard 3.5. The commentary provides that

> A private entity that renders an "accessible" building inaccessible in its <u>operation, through policies or practices</u>, may be in violation of [42 U.S.C. § 12182]. For example, a private entity can render an entrance to a facility inaccessible by keeping an accessible entrance open only during certain hours (whereas the facility is available to others for a greater length of time). A facility could similarly be rendered inaccessible if a person with disabilities is significantly limited in her or his choice of a range of accommodations.

28 C.F.R. pt. 36, app. C, at 914 (guidance to 28 C.F.R. § 36.401) (emphasis added).

Unlike the case in <u>Fortyune</u>, we are not dealing with a public accommodation's <u>use</u> of a design (e.g., a distinct policy or practice concerning to whom an accommodation is available, when an accommodation is available, or what choice of accommodations is available), but rather the <u>design</u> itself (i.e., the form and shape of a structure that render it inaccessible). <u>See</u> U.S. Br. 17 ("[T]he claim here is that the defendant[s] [adopted an] unnecessarily discriminatory design."). And <u>Antoninetti</u> counsels that, even when dealing with a "service or policy," Design Standards specifically addressing an issue are a better benchmark than more general prohibitions found in the statute itself. <u>See Antoninetti</u>, 643

30

F.3d at 1174; see also United States v. Hoyts Cinemas Corp., 380 F.3d 558, 566 (1st Cir. 2004) ("[I]t makes more sense to focus upon a somewhat uncertain regulation directed to the very problem at hand rather than an even vaguer set of statutory provisions framed in more general terms.").

By their own terms, the Design Standards provide the necessary guidance required to build an "accessible" structure. The ADA itself makes this clear: § 12183(a)(1) requires new construction to be "readily accessible" except where it is "structurally impracticable to meet the requirements of such subsection in accordance with standards set forth or incorporated by reference in regulations issued under this subchapter." 42 U.S.C. § 12183(a)(1) (emphasis added). In turn, the regulations assure that a facility is "accessible" if it "complies with these guidelines." 1991 Standard 3.5. Of course, if an entity constructs an "accessible" facility, but takes affirmative steps to bar disabled persons from enjoying it, then it has violated the ADA's prohibition of providing a separate benefit "on the basis of a disability." See 42 U.S.C. § 12182(b)(1)(A)(iii). But that is not the case here. Abercrombie built porches that, as the Plaintiffs claim, were "inaccessible" from their inception. See Aplee. Br. 50. Such a claim must be evaluated through the lens of the Design Standards; were it otherwise, an entity's decision to follow the standards and build an "accessible" facility would have little meaning. See United States v. Nat'l Amusements, Inc., 180 F. Supp. 2d 251, 258 (D. Mass 2001) (To hold that compliance with the standards is not sufficient to satisfy

31

sections 12182 and 12183 of the ADA "would render compliance with these regulations meaningless, because a fully compliant structure would always be subject to a claim under ADA § [12182]."). The porch's design—and its secondary exclusive effect—must be evaluated solely under the Design Standards. The district court erred by imposing liability on Abercrombie's design decision based on the "overarching aims" of the ADA.

The dissent agrees with our major premise, that "we must look to the Design Standards to determine whether a defendant has discriminated in the design, construction, or alteration of a facility," but disagrees with our conclusion that Abercrombie did not engage in a secondary discriminatory "use" of that design. The dissent posits that Abercrombie "uses" the porch as a "branding tool, display area, and customer lounge." However, none of these "uses" are what deny disabled people access to the porch—it is the porch itself that effects that alleged injury. In fact, the dissent points out that Abercrombie has an alternative design for the porch, one that incorporates the "same surf-shack motif" but at "ground level." By all indications, Abercrombie "uses" this design in the same manner as its stepped porches—as a "branding tool, display area, and customer lounge." This "use" is not discriminatory in one instance and non-discriminatory in the other—it is the design that differs between the two porch layouts, and that must be the sole source of accessibility discrimination. The Design Standards specifically address that issue.

32

B.       Design Standard Requirements for "Spaces"

We now turn to the Design Standards.  Abercrombie argues that the district court erred by holding that the porch is a "space" required to be accessible under the Design Standards.  Aplt. Br. 44.  After holding the porch to be a "space," the district court noted that "if nondisabled customers can get to a space, customers who use wheelchairs have to be able to get to that space as well."  Abercrombie & Fitch Co., 957 F. Supp. 2d at 1281.

The 1991 and 2010 Standards contain identical definitions of "entrance" and "space":

> **Entrance.**  Any access point to a building or portion of a building or facility used for the purpose of entering.  An entrance includes the approach walk, the vertical access leading to the entrance platform, the entrance platform itself, vestibules if provided, the entry door(s) or gate(s), and the hardware of the entry door(s) or gate(s).
>
> . . .
>
> **Space.**  A definable area, e.g., room, toilet room, hall, assembly area, entrance, storage room, alcove, courtyard, or lobby.

1991 Standard 3.5; see also 2010 Standard 106.5.  The 1991 Standards define "Accessible Space" as a "[s]pace that complies with these guidelines."  1991 Standard 3.5; see also 2010 Standard 106.5 (defining "Accessible" as "[a] site, building, facility or portion thereof that complies with this part.").

As we see it, whether the porch is a "space" is not the issue—given the

33

definition of "space" as any "definable area," it is hard to envision what is not a "space." Rather, the issue is whether the regulations in fact require that all "spaces" be accessible, as the Plaintiffs contend. Aplee. Br. 45-46; U.S. Br. 11. Because the 1991 Standards distinguish between a "space" and an "accessible space," it seems that the regulations clearly anticipated that not all "spaces" would be accessible.

The Plaintiffs take the use of "space" in the Design Standards to extremes. Their starting point is 1991 Standard 4.1.1. Aplee. Br. 46. This standard provides that "[a]ll areas of newly designed or newly constructed buildings and facilities required to be accessible by 4.1.2 and 4.1.3 . . . shall comply with these guidelines." 1991 Standard 4.1.1(1) (emphasis added). Contrary to the Plaintiffs' suggestion, Aplee. Br. 45-46, this standard does not say that "all areas" must be accessible, but rather that areas must be accessible when other standards require accessibility. So we must keep looking. Turning to the first standard listed, 4.1.2 provides that an accessible route "shall connect accessible buildings, accessible facilities, accessible elements, and accessible spaces that are on the same site." 1991 Standard 4.1.2(2) (emphasis added). Similarly, 4.1.3 requires an accessible route connecting all "accessible building or facility entrances with all accessible spaces and elements within a building or facility." 1991 Standards 4.1.3(1) (emphasis added). By their plain text, these standards do not require "spaces" to be accessible; rather, they assume that the mentioned space is already an

34

"accessible space," i.e., that another standard requires it to "compl[y] with these guidelines." 1991 Standard 3.5.

Throughout the Design Standards, the term "space" is seldom used apart from the modifier "accessible." See, e.g., 1991 Standard 4.3.2(2) ("At least one accessible route shall connect accessible . . . spaces."); id. 4.3.10 ("Accessible routes serving any accessible spaces"); id. 4.5.1 ("Ground and floor surfaces along accessible routes and in accessible rooms and spaces"); id. 4.14.1 ("Entrances required to be accessible by 4.1 shall . . . be connected by an accessible route to all accessible spaces."). The term "accessible space" is a placeholder, used throughout the standards to denote compliance with other standards regulating areas that fall under the expansive definition of "space" (e.g., those for toilet rooms (4.22), assembly areas (4.33), entrances (4.14), and storage rooms (4.25)).

Simply put, the Plaintiffs cannot point to any standard stating that every "space" shall be an "accessible space." The standards clearly indicate when something that qualifies as a "space" must be accessible, e.g., by stating that certain "entrances . . . must be accessible." 1991 Standard 4.1.3(8)(a)(i). But there is no similar requirement for "spaces" generally. To defer to the DOJ's position—the "Standards guarantee people with disabilities physical access to spaces," U.S. Br. 14—"would be to permit the agency, under the guise of interpreting a regulation, to create de facto a new regulation." Christensen v.

35

Harris Cnty., 529 U.S. 576, 588 (2000).  The standards are not ambiguous: the

expansive definition of "space" is not an independent accessibility requirement.

It was error for the district court to require that the porch be accessible because it

is simply a "space."[7]

The dissent reaches the opposite conclusion.  Our principal disagreement

concerns whether the standards require "all areas" or "spaces" to be accessible

outright unless expressly exempted.  As discussed, this expansive reading is

untenable given the standards' repeated reference to "accessible spaces" and the

specific standards regulating those areas that fall under the definition of "space."

See Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384 (1992) ("[I]t is a

commonplace of statutory construction that the specific governs the general.").

Even so, the idea that the porch is a "lobby" or "customer lounge" is a weak one,

as the porch is not a destination in itself but a means of passage into the store.

---

[7] It was also error for the district court to impose accessibility
requirements on the porch as a "space" because it contained "more than one use."
See Abercrombie & Fitch Co., 957 F. Supp. 2d at 1281.  The district court
apparently thought the porch was used as an "accessible space" because
Abercrombie made it "available to individuals who do not require wheelchairs for
mobility."  Id.  A space is not an "accessible space" because it can be accessed by
nondisabled persons; rather, it is an "accessible space" only if it "complies with
[the] guidelines" for disabled access.  1991 Standard 3.5.  The "use" envisioned
by the standards refers to those "use[s] covered by a special application section,"
e.g., "restaurants and cafeterias, medical care facilities, business and mercantile,
libraries, accessible transient lodging, and transportation facilities."  1991
Standard 4.1.1(2); see also 2010 Standard 201.2 (requiring multi-use spaces to
comply with "the applicable requirements" for each use).  The district court made
no finding that the porch contained any of these special uses.

The standards provide no safety if an entity complies with the guidelines plainly regulating a contemplated feature (e.g., an "access point to a building or portion of a building or facility used for the purpose of entering," i.e., an "entrance," 1991 Standard 3.5) only later to be told that the feature is also a "space" that must be accessible unless fitting into a limited exemption. That is not the thrust of the highly detailed ADA regulations.

C.    Entrance Standards: "Majority of People" Requirement

Abercrombie argues that the district court erred by holding that Hollister's porches violated Design Standards regulating entrances. Specifically, it argues the court erred by finding noncompliance with 1991 Standard 4.1.3(8). Aplt. Br. 39. That standard provides that

> (a)(i)  At least 50% of all public entrances . . . must be accessible. At least one must be a ground floor entrance. Public entrances are any entrances that are not loading or service entrances.
>
> (ii) Accessible entrances must be provided in a number at least equivalent to the number of exists required by the applicable building/fire codes. (This paragraph does not require an increase in the total number of entrances planned for a facility.)
>
> (iii) An accessible entrance must be provided to each tenancy in a facility (for example, individual stores in a strip shopping center).
>
> One entrance may be considered as meeting more than one of the requirements in (a). Where feasible, accessible entrances shall be the entrances used by the majority of people visiting or working in the building.

37

1991 Standard 4.1.3(8).

The district court held that, despite the fact that at least 50% of Hollister's public entrances are accessible, the store violated 1991 Standard 4.1.3(8)(a) because it was "obvious" that a majority of people enter through the inaccessible porch. Abercrombie & Fitch Co., 835 F. Supp. 2d at 1082; see also Abercrombie & Fitch Co., 957 F. Supp. 2d at 1279. Abercrombie raises two arguments: (1) that the 2010 Standards eliminated the "majority of people" requirement, thus releasing Abercrombie from this burden; and (2) even if this requirement is effective, the Plaintiffs offered no evidence of how many people enter Hollister stores through the center porch compared to the two side entrances. Id. at 39. Abercrombie is correct on both points.

As mentioned, the 1991 Standard required, among several other things, that "[a]t least 50% of all public entrances . . . must be accessible." 1991 Standard 4.1.3(8)(a)(i). In 2010, the DOJ simplified its entrance standards, providing that "at least 60 percent of all public entrances shall [be accessible]." 2010 Standard 206.4.1. The 2010 Standard omits any reference to the 1991 "majority of people" language. In other words, while the 1991 Standard regulated how many and which entrances must be accessible (if feasible), the 2010 Standard simply regulates how many entrances must be accessible. The Plaintiffs' only argument against this reading is that the DOJ intended the 2010 revision to have the "same

38

result" as the 1991 Standard. Aplee. Br. 51 (quoting 28 C.F.R. pt. 36, app B, at 835). However, the "same result" envisioned was the overall level of accessibility, not any continued requirement about which entrances must be accessible. See 28 C.F.R. pt. 36, app B, at 835. We thus agree with Abercrombie that, by abandoning the dual requirements of the 1991 Standard in favor of a straightforward percentage-of-entrances requirement, the 2010 Standard "reduce[d] the technical requirements" of the 1991 Standard. See 28 C.F.R. § 36.211(c). Therefore, Abercrombie need only comply with the simpler method of compliance—that a certain percentage of its public entrances be accessible.[8] See 2010 Standard 206.4.1.

To be sure, the new method is simpler. Although the Plaintiffs sought summary judgment that the porch was used by a majority of people visiting or working in the store (and the district court viewed it as apparent), no evidence supports that proposition. We need not decide whether the porch designer's intentions or actual empirical evidence concerning porch use by visitors or

---

[8] We need not decide whether the percentage is 50% or 60%, as Abercrombie meets either. We will not consider the Plaintiffs' argument to the contrary, Aplee. Br. 51 n.13, as it is raised for the first time on appeal, see Valdez v. Squier, 676 F.3d 935, 950 (10th Cir. 2012). In any event, their argument—that the porch actually constitutes two entrance "doors"—fails to take into account that the standards regulate the number of "entrances," see 1991 Standard 4.1.3(8)(a)(i); 2010 Standard 206.4.1, and that one "entrance" may be made up of more than one "entry door(s)," see 1991 Standard 3.5.

employees would have been necessary to create a triable issue.[9]  Given three side-by-side entrances, logic alone will not suffice.  The Plaintiffs assert that the porch was intended to be used by the majority of people.  Aplee. Br. 50.  Abercrombie maintains that it is just as likely that the majority of people prefer a more direct route (all entrances have the same terminus) rather than ascending and descending the porch.  See III Aplt. App. 728.  It is an open question, and one which we do not resolve.[10]

Accordingly, we hold that each of the district court's grounds for awarding the Plaintiffs summary judgment are unsupportable.  It was error to impose liability on the design of Hollister stores based on "overarching aims" of the ADA.  It was also error to impose liability based on the holding that the porch as

---

[9] The regulatory guidance does not mention the "majority of people" provision, see 28 C.F.R. pt. 36, app. C, at 929 (guidance to 4.1.3(8)), nor does the analysis and commentary to the 2010 standards, see 28 C.F.R. pt. 36 app. B, at 822-23 (analysis of "Public Entrances").  No published case has ever imposed ADA liability on a public accommodation for violating the "majority of people" component of 4.1.3(8)(a).

[10] The dissent offers that the Plaintiffs presented "deposition testimony, declarations, photographic evidence, and architectural drawings that all support a reasonable inference that a majority of people use the porch entrance."  Responding to a summary judgment motion, Plaintiffs had the burden of providing significantly probative evidence establishing an essential element of their case.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The Plaintiffs' summary judgment evidence demonstrates nothing more than the porch's existence positioned between two nearby doors.  We simply do not know about utilization of the various entrances.  Regardless, this question is now irrelevant, as we hold that the 2010 Standards effectively eliminated the additional majority-of-people requirement in the 1991 Standards.

40

a "space" must be accessible. Finally, it was error to hold that the porch must be accessible because it is the entrance used by a "majority of people."

We AFFIRM the district court's denial of Abercrombie's summary judgment motion. We AFFIRM the district court's certification of the class. However, we REVERSE the district court's partial grant, and later full grant of summary judgment to the Plaintiffs, and we VACATE the court's permanent injunction. We REMAND this case for proceedings consistent with this opinion. All pending motions are DENIED.

No. 13-1377, *Colo. Cross-Disability Coalition v. Abercrombie & Fitch*

**McHUGH**, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's sound analysis and ultimate conclusion that Ms. Farrar has standing under Article III. However, I respectfully dissent from the majority's conclusion regarding numerosity. As a result, I would hold that the district court abused its discretion in certifying the class. I also respectfully dissent from the court's conclusion that Abercrombie did not violate Title III of the ADA. I would therefore affirm the injunction as it relates to the Park Meadows store but reverse the class certification order and vacate the injunction as it relates to other Hollister stores.

I.      Class Certification

I agree with most of the majority's thoughtful analysis on class certification, including the relationship of standing to class representation. But I part ways on the issue of numerosity. I would hold that at this point in the litigation, the Plaintiffs were required to present more evidence to meet their burden of establishing the numerosity requirement of Rule 23(a) of the Federal Rules of Civil Procedure, with respect to the class as defined.

In my view, the Plaintiffs have failed to establish facts from which a reasonable inference can be drawn as to the number of members of the defined class. Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." While impracticability is not "a question of numbers,"

Horn v. Associated Wholesale Grocers, Inc., 555 F.2d 270, 275 (10th Cir. 1977), that is not to say that numbers are irrelevant. Indeed, the text of Rule 23(a)(1) indicates that the impracticability of joinder must be due to the class being numerous. See Fed. R. Civ. P. 23(a)(1). As the majority notes, impracticability turns on "[a] variety of factors," such as "the nature of the action, the size of the individual claims, and the location of the members of the class or the property that is the subject matter of the dispute." See 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1762, at 206–07 (3d ed. 2005) (footnote omitted). But "[t]he most obvious consideration is the size of the class itself." Id. at 177. Thus, a proper numerosity analysis should consider how the size of the class affects the practicability of joinder given "the particular circumstances of the case." See Rex v. Owens ex rel. State of Okl., 585 F.2d 432, 436 (10th Cir. 1978).

In applying this rule, the Tenth Circuit has rejected any "arbitrary limit," Horn, 555 F.2d at 275, "set formula," Rex, 585 F.2d at 436, or presumptive numerical threshold. Trevizo v. Adams, 455 F.3d 1155, 1162 (10th Cir. 2006). And proof of "absolute numbers" is unnecessary, at least in the context of injunctive or declaratory relief. Horn, 555 F.2d at 276; see also 7A Wright & Miller, supra, § 1762, at 177–84.

But this caution against a formulaic, rigid approach to impracticability does not excuse the party seeking certification from providing evidence as to the size

2

of the particular class that has been defined. Nor does it excuse the district court from considering the impact of the size of the class on other factors in the case as it undertakes its "'rigorous analysis'" of the practicability of joinder. See Wal-Mart Stores, Inc. v. Dukes, ___ U.S. ___, 131 S. Ct. 2541, 2551 (2011). The requirements of Rule 23(a) are "stringent guidelines," Rex, 585 F.2d at 435, and "actual, not presumed, conformance with Rule 23(a) remains . . . indispensable." General Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160 (1982). The composition of a class need not be readily ascertainable in a suit for injunctive or declaratory relief. Shook v. El Paso Cnty., 386 F.3d 963, 972 (10th Cir. 2004); Horn, 555 F.2d at 276 ("[W]here . . . the class is composed of a substantial number, no great need is present to identify each and every one."). But even for injunctive and declaratory relief, the party seeking certification must produce "some evidence of established, ascertainable numbers constituting the class" "or otherwise establish by reasonable estimate the number of class members who may be involved" "in order to satisfy even the most liberal interpretation of the numerosity requirement." Rex, 585 F.2d at 436 (emphasis added); William B. Rubenstein, Newberg on Class Actions § 3:13 (5th ed.) ("[A] good-faith estimate of the class size is sufficient when the precise number of class members is not readily ascertainable.").

In the present case, the class is: people with disabilities who use wheelchairs and who have faced discrimination because of the presence of a

3

raised porch at any Hollister store in the two years prior to the filing of the complaint in this case. See Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co., No. 09-CV-02757-WYD-KMT, 2012 WL 1378531, at \*1 (D. Colo. Apr. 20, 2012) (defining the class at hand). Although the remedy requested in this case is injunctive relief, it is brought on behalf of a relatively narrow group of class members. Only those persons using wheelchairs who suffered past discrimination as a result of the raised porches, and only the subset of that group who were deterred by the raised porches within the two years immediately preceding the filing of the complaint in this action. In my view, the Plaintiffs have not offered any evidence from which even a reasonable estimate of the number of members of this class can be made.[1]

Furthermore, requiring some evidence of class size is consistent with the Supreme Court's characterization of the burden Rule 23(a) places on the proponent of a class:

> Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact,

---

[1] Although meeting the numerosity requirement as I interpret it requires some effort on the part of a proponent of a class, CCDC has demonstrated in other litigation that as a general matter, it is capable of meeting this burden. See Colo. Cross-Disability Coal. v. Taco Bell Corp., 184 F.R.D. 354, 358 (D. Colo. 1999) (finding a potential class that "may include more than 2,000 people" based on census data and survey results provided by CCDC demonstrating that 14.5% of the 200 people who responded fit the class definition).

etc.

Wal-Mart Stores, 131 S. Ct. at 2551 (emphasis in original); see also Trevizo, 455 F.3d at 1162 (referring to the burden as "a strict burden of proof" (internal quotation marks omitted)). Thus, "mere speculation as to the number of parties involved is not sufficient to satisfy Rule 23(a)(1)." 7A Wright & Miller, supra, § 1762, at 181–84; accord Rubenstein, supra, § 3:13. Rather than proceeding based on such speculation, we have required in other contexts that when facts are established by inferences drawn by the finder of fact, such inferences must be based on evidence. Sunward Corp. v. Dun & Bradstreet, Inc., 811 F.2d 511, 521–22 (10th Cir. 1987). Therefore, "a plaintiff must show enough evidence of the class's size to enable the court to make commonsense assumptions regarding the number of putative class members." Rubenstein, supra, § 3:13.[2]

---

[2] In Horn v. Associated Wholesale Grocers, Inc., 555 F.2d 270 (10th Cir. 1977), we acknowledged that other courts have stated that "where the relief sought is injunctive and declaratory, even speculative and conclusory representations as to the size of the class are sufficient." Id. at 275–76 (citing Doe v. Flowers, 364 F. Supp. 953, 954 (N.D.W. Va. 1973) (three-judge panel) (per curiam), aff'd mem., 416 U.S. 922 (1974)). Although the Fourth Circuit has relied on this statement, it has not excused parties from first establishing the existence of the class. See Doe v. Charleston Area Med. Ctr., Inc., 529 F.2d 638, 645 (4th Cir. 1975). To the extent Horn approved of the statement that speculative and conclusory representations are sufficient, it was not necessary to the holding in Horn because that case involved a class of specified size. See 555 F.2d at 275–76 (concluding that the district court abused its discretion because it became "stymied by the concept of very large numbers" and ignored other factors relevant to impracticability). Furthermore, relying on speculative and conclusory representations is inconsistent with later Supreme Court and Tenth Circuit precedent. See Wal-Mart Stores, Inc. v. Dukes, ___ U.S. ___, 131 S. Ct. 2541,

Here, I would conclude that the Plaintiffs did not provide the district court with enough to make commonsense assumptions about the size of the defined class. The majority finds numerosity to be established because "porches were present at nearly 250 Hollister stores in over 40 states," "CCDC submitted declarations from five of its members who averred that they shop at malls where Hollister stores are located," and "there are millions of Americans with disabilities." Maj. Op. 19. The first fact is relevant to "the location of the . . . subject matter of the dispute." 7A Wright & Miller, supra, § 1762, at 206–07. This fact certainly pertains to the issue of impracticability, but by itself it does nothing to establish the size or even the existence of a class. The second fact—declarations submitted by five CCDC members—is problematic in establishing the size of a class because each of these five members was a named party to the present litigation, presented to the district court as proposed class representatives. I Aplt. App. 148, 158. "[I]f there are no members of the class other than the named representatives, then Rule 23(a)(1) obviously has not been satisfied." 7A Wright & Miller, supra, § 1762, at 171–72. Although four of the five CCDC members withdrew from the litigation, the declarations do little by themselves to provide a reasonable estimate of the size of the class.[3] I would

2551 (2011); DG ex rel. Stricklin v. Devaughn, 594 F.3d 1188, 1194 (10th Cir. 2010); Rex v. Owens ex rel. State of Okl., 585 F.2d 432, 436 (10th Cir. 1978).

[3] The Plaintiffs did not rely on the five declarations to establish numerosity below, nor have they done so on appeal.

6

reach the same conclusion even if the record evidence is supplemented on appeal by public census data, of which the Plaintiffs ask us to take judicial notice.

In my view, the relevant numerosity inquiry here is whether reasonable inferences can be drawn from the five declarations in combination with the census data to provide a reasonable estimate of the size of the class. Relying on the census data, the Plaintiffs note that in 2010, "approximately 1.5 percent of the population or 3.6 million people nationwide used wheelchairs for mobility," and that the percentage of people who use wheelchairs in each state is similar according to the most recent data. Aplee. Br. 39–40. Even if I were to delve deeper into the census data than the Plaintiffs have done in their briefing to this court and estimate the number of people who use wheelchairs in states that have Hollister stores with porches, that number does not provide a reasonable estimate of the number of persons who use wheelchairs and who have faced discrimination because of the presence of a raised porch at any Hollister store during the relevant two-year period. See Colo. Cross-Disability Coal., No. 09-CV-02757-WYD-KMT, 2012 WL 1378531, at *1.[4] Simply put, nothing about the raw numbers provides a basis for estimating how many people who use wheelchairs were actually

---

[4] Although no party has raised the issue, I am also troubled by the fact that the class seeking injunctive relief is defined solely in terms of past injury. Such disjunction between the relief sought and the injuries alleged by the class does not present a problem of standing or class certification. Devaughn, 594 F.3d at 1197–98. Rather, it presents a problem of whether the class is entitled to injunctive relief. Lewis v. Casey, 518 U.S. 343, 359–60 & n.7 (1996).

7

discriminated against at a Hollister store during the identified two years due to its raised porches. Furthermore, that number cannot be extrapolated because Plaintiffs have provided no evidence that the five CCDC members are indicative of people who use wheelchairs in Colorado and the other states that have Hollister stores with porches. Indeed, in its memorandum in opposition to the motion to certify, Abercrombie pointed to deposition testimony suggesting that at least two of the five CCDC members were sent to Hollister stores to test for compliance. II Aplt. App. 492. Where these CCDC members were recruited to visit Hollister stores, they provide little help in extrapolating the possible number of people who use wheelchairs and who have shopped at Hollister stores in other states.[5]

Admittedly, we grant the district court "wide latitude" in making the numerosity determination. Trevizo, 455 F.3d at 1162. But we do so "because it is . . . a fact-specific inquiry," id., and therefore implicates the district court's discretion to make rational inferences from that evidence. Vallario v. Vandehey, 554 F.3d 1259, 1264 (10th Cir. 2009). But such inferences must be based on evidence. See Sunward Corp., 811 F.2d at 521–22; cf. Rex, 585 F.2d at 436 (stating that party seeking certification must produce "some evidence"). Here, the

---

[5] It is not their status as testers that is problematic in extrapolating the size of the class based on these plaintiffs; rather, it is the fact that they may not have fallen within the definition of the class without having been recruited by CCDC for this litigation. This undermines the reasonableness of using such plaintiffs as statistically representative of the number of people who fall within the class definition in other states.

8

Plaintiffs did not provide any evidence of established, ascertainable numbers or otherwise establish by reasonable estimate the number of persons using wheelchairs who have been discriminated against by the presence of Hollister's raised porches within the relevant two-year period. See Rex, 585 F.2d at 436 (concluding that the district court did not abuse its discretion in refusing to certify a class seeking injunctive and declaratory relief when the plaintiff presented no evidence of the size of the class).

Instead, the Plaintiffs proved a class size of anywhere from five members to 3.6 million members, which does not constitute a reasonable estimate. While commonsense assumptions and reasonable inferences can help narrow that range, the Plaintiffs failed to provide any evidence from which a reasonable estimate of the number of class members may be deduced. This does not meet the admittedly low threshold required for certification of a class seeking injunctive relief. To hold otherwise would eviscerate the numerosity requirement in Rule 23(a) and run contrary to the Supreme Court's admonition that the proponent of a class must "affirmatively demonstrate his compliance with the Rule." See Wal-Mart Stores, 131 S. Ct. at 2551. As a result, I would hold the district court's ruling amounted to a "[m]aterial misapplication of the Rule 23 factors." See Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc., 725 F.3d 1213, 1217 (10th Cir. 2013) (concluding that the district court abused its discretion by, among other things, relaxing the burden of proof under Rule 23(a)). I would therefore reverse

9

the certification order.

II.    ADA Violation

Because I would reverse the certification order, I address the merits of the case only as it relates to the Park Meadows store. Unlike the majority, I would hold that Abercrombie violated Title III of the ADA in two respects. First, I would conclude that the porch is a space that is required to be accessible and thus violates the ADA by not being connected to an accessible route. Second, I would conclude that Abercrombie's use of the porch violates the ADA by denying customers who use wheelchairs the opportunity to participate and instead providing them a separate, unequal, non-integrated benefit.

"Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals." PGA Tour, Inc. v. Martin, 532 U.S. 661, 674 (2001). "In studying the need for such legislation, Congress found that 'historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem.'" Id. at 674–75 (quoting 42 U.S.C. § 12101(a)(2)). Congress also found that "individuals with disabilities continually encounter various forms of discrimination, including . . . the discriminatory effects of architectural . . . barriers." 42 U.S.C. § 12101(a)(5). "After thoroughly investigating the problem, Congress concluded that there was a compelling need for a clear and

10

comprehensive national mandate to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life." PGA Tour, 532 U.S. at 675 (internal quotation marks omitted). "In the ADA, Congress provided that broad mandate." Id. Twelve years after Congress passed the ADA, Abercrombie opened a store in the Park Meadows Mall designed with a distinctive area open to the public but accessible only to ambulatory persons, thereby relegating patrons who use wheelchairs to non-integrated, second-class areas. I believe the ADA and the regulations promulgated under it prohibit this conduct.

A.    Spaces, Entrances, & Routes

My disagreement with the majority is simple. As the majority reads the guidelines, spaces in a newly constructed facility need not be accessible unless a specific standard directly requires as much. As I read the guidelines, all spaces in a newly constructed facility must be accessible unless specifically exempted. Both the 1991 and 2010 Design Standards require all non-exempted spaces to be connected by an accessible route. Accessible routes cannot have stairs. I would conclude that the porch at issue here is a non-exempt space that is not on an accessible route and that Abercrombie has therefore violated the ADA by designing and constructing a non-compliant facility.

11

a.      All spaces are required to comply with the regulations unless otherwise exempted.

The 1991 Design Standards begin with the general requirement that all non-exempt areas must comply with the guidelines:

> All areas of newly designed or newly constructed buildings and facilities required to be accessible by 4.1.2 and 4.1.3 and altered portions of existing buildings and facilities required to be accessible by 4.1.6 shall comply with these guidelines, 4.1 through 4.35, unless otherwise provided in this section or as modified in a special application section.

1991 Standard 4.1.1(1); accord 2010 Standards 201.1, 203.1. The phrase "required to be accessible by 4.1.2 and 4.1.3" could be read as modifying either "All areas" or "newly designed or newly constructed buildings and facilities." If read to modify "All areas," as the majority does, the rule reads as follows:

> All areas . . . required to be accessible by 4.1.2 and 4.1.3 and . . . 4.1.6 shall comply with these guidelines, 4.1 through 4.35, unless otherwise provided in this section or as modified in a special application section.

1991 Standard 4.1.1(1). As the majority notes, the Design Standards define "accessible" as "[d]escrib[ing] a site, building, facility, or portion thereof that complies with these guidelines." Id. 3.5; accord 2010 Standard 106.5. The majority correctly states that nothing in standards 4.1.2, 4.1.3, and presumably 4.1.6 expressly requires all spaces to comply with the guidelines. Unlike the majority, I am convinced that overarching requirement is present in standard

12

4.1.1(1) itself.

When the phrase in section 4.1.1(1), "required to be accessible by 4.1.2 and 4.1.3," is read to modify "newly designed or newly constructed buildings and facilities," the meaning becomes clear:

> All areas of newly designed or newly constructed buildings and facilities . . . shall comply with these guidelines, 4.1 through 4.35, unless otherwise provided in this section or as modified in a special application section.

Id. Under this reading, if a new building is subject to the requirements of 4.1.2 or 4.1.3, then all areas of that building must also comply with the guidelines, unless otherwise provided.[6] The propriety of this reading—that all areas must comply unless exempted—is reinforced by the explicit statement in standard 4.1.1 that certain "non-occupiable spaces . . . frequented only by service personnel for repair purposes" are not required to comply with the guidelines. 1991 Standard 4.1.1(5)(b)(ii). If spaces were never required to comply with the guidelines in the first instance, there would be no reason to exempt certain types of spaces.

This reading is also reinforced by the clarification of this provision in the 2010 Design Standards and its elaboration on the list of exceptions. The 2010

_____

[6] When the Standards say the areas must comply with the guidelines, that means the areas must be accessible. 1991 Standard 3.5 (Accessible means "a site, building, facility, or portion thereof that complies with these guidelines."). Compare 4.1.3(19) (requiring assembly areas to comply with 4.33), with 4.33.1 ("Assembly and associated areas required to be accessible by 4.1 shall comply with 4.33").

13

standards remove the confusing language and state, "<u>All areas</u> of newly designed and newly constructed buildings and facilities and altered portions of existing buildings and facilities <u>shall comply with these requirements</u>." 2010 Standard 201.1 (emphasis added). Thus, the 2010 Design Standards leave no doubt that all areas of newly constructed buildings must comply.[7] The new standards further state, "Sites, buildings, facilities, and elements are exempt from these requirements <u>to the extent specified by 203</u>." <u>Id.</u> 203.1 (emphasis added). Although standard 203.1 does not list "spaces" generally as exempt, the enumerated list of exceptions includes several areas specifically identified as "spaces," such as "limited access spaces" and "machinery spaces." <u>See, e.g.</u>, 2010 Standards 203.4, 203.5. Again, the exemption of certain types of spaces supports a reading in which all spaces are otherwise subject to the guidelines.

I am convinced this interpretation is the correct reading of the 1991 standards. But at the very least, standard 4.1.1(1) is ambiguous. When a regulation is ambiguous, we must defer to the agency's interpretation of its own regulations, even in an amicus brief. <u>Auer v. Robbins</u>, 519 U.S. 452, 462 (1997); <u>see also</u> <u>Christensen v. Harris Cnty.</u>, 529 U.S. 576, 588 (2000). Ambiguity exists

_____

[7] The Department of Justice's Analysis and Commentary on the 2010 ADA Standards for Accessible Design discusses "selected substantive changes" between the 1991 Design Standards and the 2010 Design Standards. 28 C.F.R. Pt. 36, App. B at 829. The commentary does not address "[e]ditorial changes." <u>Id.</u> With respect to the amendment reflected in standard 201.1, the commentary is silent.

14

when "[n]o statute or regulation squarely addresses" the issue. See Talk Am., Inc. v. Michigan Bell Tel. Co., ___ U.S. ___, 131 S. Ct. 2254, 2260–61 (2011). Therefore, I would defer to the Department of Justice's interpretation of the Design Standards: all non-exempt areas must comply with the guidelines.

If all "areas" must comply, a "space" must comply. This is because the Design Standards define "space" as a "definable area." 1991 Standard 3.5 (emphasis added). Thus, when the Design Standards state that all "areas" must comply with the guidelines unless exempted, I would conclude this requires all non-exempt "spaces" to comply. I do not share the majority's concern about "the expansive definition of 'space'" in the Design Standards. Maj. Op. 34. Although "definable area" could be read expansively, the enumerated list of spaces places a limit on that definition. "[T]he commonsense canon of noscitur a sociis . . . counsels that a word is given more precise content by the neighboring words with which it is associated." Freeman v. Quicken Loans, Inc., ___ U.S. ___, 132 S. Ct. 2034, 2042 (2012). Thus, a "space" must not only be a definable area, but it must be a definable area in the same manner as a "room, toilet room, hall, assembly area, entrance, storage room, alcove, courtyard, or lobby." See 1991 Standard 3.5; accord 2010 Standard 106.5.

The raised porch at issue is a "space." Indeed, the majority concludes that the porch is an entrance, separate from the two entrances flanking the porch. See Maj. Op. 37-38; see also 1991 Standard 3.5 (defining entrance); accord 2010

15

Standard 106.5 (same). As an "entrance," the porch would expressly fall within the definition of a "space." But as discussed more fully below, I would conclude that the porch is not just an entrance. It is also an area that is definable in the same sense as a room or lobby. See 1991 Standard 3.5; 2010 Standard 106.5. However, I agree with the majority that concluding the porch is a space does not end the inquiry. We must next determine whether the space is exempt from compliance with the guidelines. I would conclude that it is not. The porch is a non-exempt space that is required to be connected to an accessible route. As described below, it was not connected to an accessible route and, therefore, does not meet either the 1991 or 2010 Design Standards.

      b.     <u>The porch does not comply with the ADA under the 1991 Design Standards</u>.

To determine whether a space complies with the Design Standards, I would look first to any general exceptions. I would then look to the specific requirements for the type of space involved to determine what compliance entails and whether the specific standards contain any relevant exceptions.

Under the 1991 Design Standards, section 4.1.1 provides a list of spaces and other areas that are exempt from the guidelines:

> Accessibility is not required to (I) observation galleries used
> primarily for security purposes; or (ii) in non-occupiable spaces
> accessed only by ladders, catwalks, crawl spaces, very narrow
> passageways, or freight (non-passenger) elevators, and frequented
> only by service personnel for repair purposes; such spaces include,
> but are not limited to, elevator pits, elevator penthouses, piping or

16

equipment catwalks.

1991 Standard 4.1.1(5)(b).[8] In the present case, deposition testimony, photographic evidence, and architectural drawings all establish that the porch is neither an observation gallery used primarily for security purposes nor a non-occupiable space accessed only by ladders, etc., and frequented only by service personnel for repair purposes. Thus, this general exception does not exempt the porch from the requirement that it comply with the regulations and Abercrombie does not argue otherwise.

Nor, in my view, is the porch exempt as an entrance under the 1991 Design Standards. The 1991 Design Standards state, "At least 50% of all public entrances . . . must be accessible." Id. 4.1.3(8)(a)(I). The negative inference of standard 4.1.3(8) is that half of all public entrances need not comply with the guidelines. However, the standard further provides, "Where feasible, accessible entrances shall be the entrances used by the majority of people visiting or working in the building." Id. 4.1.3(8)(a).

The majority concludes that no evidence was presented from which the district court could infer that the porch was used by a majority of people visiting or working in the Park Meadows Hollister. I disagree. Unlike the lack of evidence

---

[8]  Standard 4.1.1 also contains an exception for structural impracticability. 1991 Standard 4.1.1(5)(a). Abercrombie has not argued that the porch is exempt from compliance on this basis.

17

supporting the district court's inference as to class size, the record contains deposition testimony, declarations, photographic evidence, and architectural drawings that all support a reasonable inference that a majority of people use the porch entrance at the Park Meadows Hollister. The four CCDC members who are no longer named parties in this litigation submitted declarations stating that the side entrances were difficult to find and "looked like shutters . . . indistinguishable from the rest of the shutters on the exterior of the store." I Aplt. App. 118, 121, 123–24, 126–27. The side entrances have since been modified to make them more visible. III Aplt. App. 734–36. But Ms. Farrar did not see the two side entrances at the Park Meadows Hollister after the modifications took place, id.; II Aplt. App. 462, 657, though she admittedly did not continue to look for accessible entrances after being deterred by the porch, II Aplt. App. 462, 657–59.

The inference that the porch was the entrance used by the majority of visitors is also supported by Abercrombie's own actions. Indeed, it was not until after this litigation began that Abercrombie directed store managers to unlock the side entrances when opening the store. III Aplt. App. 734. And Abercrombie representatives declared that the porch was designed to draw customers into the store. III Aplt. App. 732–33. Tellingly, Abercrombie submitted a declaration stating that roping off the porch entrance "would be confusing to customers" and

would cause "immense and unquantifiable loss in sales and revenue." III Aplt. App. 1071.

In my view, this evidence combined with the photographs and architectural drawings illustrate that the porch is the focal point of the storefront, with trees, decorations, upholstered chairs, mannequins displaying merchandise, and a large marketing image on the back wall. I Aplt. App. 298–302; Aplee. Br. 7. Furthermore, the photographs of the Park Meadows Hollister storefront depict a large pillar blocking one's view of the side entrance into the "Bettys" section of the store.[9] I Aplt. App. 298–302. I would hold that it is a small and imminently reasonable step to infer from this evidence that a majority of people use the porch to enter the Park Meadows Hollister. And because Abercrombie has identified no contrary evidence to support a <u>reasonable</u> inference that a majority of people do not use the porch to enter the store, no genuine dispute of material fact exists on this point.[10]

Because a majority of people use the porch entrance, the porch entrance was required to be "accessible." 1991 Standard 4.1.3(8)(a). As an "accessible entrance," the porch was required to be on an "accessible route":

---

[9] See photograph attached at the end of this decision as Attachment 1.

[10] Although Abercrombie has challenged whether CCDC adequately proved the porch is the entrance used by the majority of customers, it has never suggested or offered any evidence that the porch, in fact, is not the main entrance to the store.

19

> Entrances required to be accessible by 4.1 shall be part of an accessible route complying with 4.3. . . . They shall also be connected by an accessible route to all accessible spaces or elements within the building or facility.

Id. 4.14.1; see also id. 4.1.3(1) ("At least one accessible route complying with 4.3 shall connect accessible building or facility entrances with all accessible spaces and elements within the building or facility."); id. 4.3.2(2) ("At least one accessible route shall connect accessible buildings, facilities, elements, and spaces that are on the same site."); id. 4.3.2(3) ("At least one accessible route shall connect accessible building or facility entrances with all accessible spaces and elements and with all accessible dwelling units within the building or facility."). An "accessible route" is a "continuous unobstructed path connecting all accessible elements and spaces of a building or facility" that "may include corridors, floors, ramps, elevators, lifts, and clear floor space at fixtures." Id. 3.5. Of particular relevance here, "[a]n accessible route does not include stairs, steps, or escalators." Id. 4.3.8 (emphases added). Because it was accessible only by stairs, the porch was not connected to an accessible route. Therefore, it violates the 1991 Design Standards.

The porch also violates the 1991 Design Standards as a space in other respects. The majority concludes that because the porch is an entrance, the porch need only comply with guidelines relating to entrances. But as I indicated above, the porch is not just an entrance. Abercrombie submitted declarations and

20

deposition testimony to the district court characterizing the porch as a "display area." See III Aplt. App. 738, 968, 971–72. One Abercrombie official explained, "It's not really an entrance, it's more of a display area." III Aplt. App. 968. Another stated that the porch is "used as a visual display analogous to a store window in another retail store." III Aplt. App. 971–72; see also id. at 738. The record also establishes that the porch is a definable area much like a room or lobby, III Aplt. App. 908–09, which functions as a customer lounge and as a distinct marketing space, designed to draw customers into the store and strengthen the Hollister brand and image. Id. at 732–33.

Where a space has multiple uses, each portion of the space must comply with the requirements applicable to that use. See Caruso v. Blockbuster-Sony Music Entm't Ctr. at the Waterfront, 193 F.3d 730, 737–38 (3d Cir. 1999) (Alito, J.) (holding that an assembly area was required to be on an accessible route because all "accessible spaces" are required to be on an accessible route, "regardless of whether or not the facility [was] also required to meet the more specific DOJ Standards concerning fixed seating plans" for assembly areas); cf. 1991 Standard 4.1.1(2) ("When a building or facility contains more than one use covered by a special application section, each portion shall comply with the requirements for that use.");[11] Talk Am., 131 S. Ct. at 2265 & n.6 (stating under a

_____

[11] The 1991 Design Standards phrase the principle in terms specific to "special application sections." But the 2010 Design Standards clarify that the

21

different regulatory scheme that when telephone wires and cables can be used for different functions, "regulatory treatment can vary depending on [their] use").

The 1991 Design Standards do not have any provisions directed specifically at display areas or customer lounges. But in each of these ways, the porch is a space—i.e, a definable area in the same manner as a room or lobby. As with non-exempt entrances, all non-exempt spaces are required to be on an accessible route. 1991 Standard 4.1.2(2) ("At least one accessible route complying with 4.3 shall connect accessible buildings, accessible facilities, accessible elements, and accessible spaces that are on the same site."); id. 4.1.3(1) ("At least one accessible route complying with 4.3 shall connect accessible building or facility entrances with all accessible spaces and elements within the building or facility."); id. 4.3.2(3) ("At least one accessible route shall connect accessible building or facility entrances with all accessible spaces and elements and with all accessible dwelling units within the building or facility.").

Having determined that the porch is a space that functions as a display area and customer lounge, and, therefore, is generally covered by the guidelines, I next consider whether it falls within an exception. Some display areas may qualify as a

principle applies generally as well: "Where a site, building, facility, room, or space contains more than one use, each portion shall comply with the applicable requirements for that use." 2010 Standard 201.2.

22

"space" while also being exempted by the exceptions for employee work areas. Standard 4.1.1(3) places limits on the requirements for "[a]reas that are used only as work areas." Id. 4.1.1(3). But the porch does not qualify as an exempt work area because it is open to customers, see id., and I am aware of no other exception that would exempt this space from compliance with the Design Standards.

In summary, the Design Standards contain an overarching requirement that all areas—including spaces—must comply with the guidelines. In turn, the guidelines require that all non-exempt spaces be on an accessible route. Unlike the majority, I would conclude that the porch is a non-exempt entrance which must comply with the 1991 Design Standards. But even if the majority is correct that the standards governing entrances exempt the porch from the accessible route provisions as an entrance, the accessible route provisions are equally applicable to the porch as a definable area like a room or lobby, which is used as a display area and customer lounge. Thus, I would hold that the porch does not comply with the 1991 Design Standards because it is not on an accessible route.

As the majority explains, any injunctive relief based on the violation of the 1991 standards would require compliance with the 2010 Design Standards. If those newer standards exempt the porch from being on an accessible route, then, as the majority notes, Abercrombie effectively will be deemed to be in compliance. I am convinced that the 2010 Design Standards also require the porch to be on an accessible route as a display area and customer lounge. Thus, even if

23

the porch is an exempt entrance under the 2010 Design Standards, it must be on an accessible route.

      c.     <u>To be brought into compliance with the 2010 Design Standards, the porch must be on an accessible route</u>.

I agree with the majority that because the majority-use requirement was removed from the 2010 Design Standards, the standards governing entrances no longer require the porch, as an entrance, to be on an accessible route. But the standards governing spaces used for purposes other than entrances have not changed. Therefore, I would hold that the porch must be on an accessible route to be brought into compliance with the 2010 Design Standards.

As a definable area similar to a room or lobby, the porch is a space and is not exempt under any general exceptions. The 2010 Design Standards expanded and elaborated upon the list of exceptions contained in the 1991 Design Standards. Exceptions addressing spaces in the 2010 Design Standards include "[a]reas raised primarily for purposes of security, life safety, or fire safety," 2010 Standard 203.3; "[s]paces accessed only by ladders, catwalks, crawl spaces, or very narrow passageways," <u>id.</u> 203.4; "[s]paces frequented only by service personnel for maintenance, repair, or occasional monitoring of equipment," <u>id.</u> 203.5; and certain employee work areas. <u>Id.</u> 203.9. All such spaces "shall not be required to comply with these requirements <u>or to be on an accessible route</u>." <u>Id.</u>

24

203 (emphasis added). The porch, which is used as a display area and customer lounge, does not fall into any of these general exceptions.

Nor does any more specific exception exempt the porch from complying with the accessible route requirement in this context. Because the area qualifies as a "space," as discussed above, it is required to be on an accessible route unless exempted by some other provision. See id. 201.1, 203.1, 206.2.2, 206.2.4. As with the 1991 Design Standards, a space may be exempt as an employee work area, see id. 203.9, but the 2010 Design Standards define an "employee work area" as "[a]ll or any portion of a space used only by employees and used only for work." Id. 106.5. The porch is not exempted because it is open to customers and is not used only for employee work. Thus, I would hold that the porch is a non-exempt space and must be on an accessible route. Id. 206.2.2, 206.2.4.

To the extent there is any ambiguity in what the regulations require, placing the porch on an accessible route is "consistent with the ADA's purpose of enabling people with disabilities to share equally in the benefits provided by a public accommodation." Caruso, 193 F.3d at 733. It is also consistent with the interpretation advanced by the Department of Justice, which is entitled to deference. Auer, 519 U.S. at 462.

Thus, as with the 1991 Design Standards, even if the provisions governing entrances in the 2010 Design Standards exempt the porch from complying with the accessible route provisions as an entrance, the accessible route provisions

25

apply to the porch as a display area and customer lounge. See 2010 Standard 201.2 ("Where a site, building, facility, room, or space contains more than one use, each portion shall comply with the applicable requirements for that use."). While the doors at the end of the porch are exempt and thus need not be on an accessible route, the porch itself must be connected to at least one accessible route. More simply, although Abercrombie may design its stores to provide access to the interior of the store through the side doors, it cannot deprive the wheelchair-using public from complete access to the distinct space that is the porch.

B.      Denial of Participation, Separate & Unequal Benefit & Integration

I agree with the majority that we must look to the Design Standards to determine whether a defendant has discriminated in the design, construction, or alteration of a facility, but that discrimination in the use of a facility is controlled by other regulatory and statutory provisions.[12] But nothing prohibits the Plaintiffs from arguing—as they have both below and on appeal—that Abercrombie has discriminated both in terms of design and use of the facility. Abercrombie uses

---

[12] "Use" of a facility may be relevant to determining which design standards apply. In this sense, it is not a defendant's use of a facility that is discriminatory; rather, the defendant's use may give rise to an obligation to design the facility in a certain way. But "use" of a facility may also be relevant in that a defendant's use may itself be discriminatory if the defendant's (in)actions violate the more general statutory or regulatory provisions of the ADA. See 42 U.S.C. § 12182(b)(1).

26

the space as a distinct branding tool, display area, and customer lounge that is not accessible to people who use wheelchairs. I would hold that this use qualifies as "discrimination" within the meaning of Title III of the ADA.

Title III of the ADA contains a list of general activities that it defines as discrimination: the denial of an opportunity to participate, 42 U.S.C. §§ 12182(b)(1)(A)(i), 12182(b)(1)(C); the provision of an unequal benefit, id. § 12182(b)(1)(A)(ii); and the provision of a separate benefit, unless doing so is necessary to provide a benefit that is as effective as that provided to others. Id. § 12182(b)(1)(A)(iii).[13] Furthermore, the statute requires benefits provided to people with disabilities to be afforded in the most integrated setting appropriate to the needs of the individual. Id. § 12182(b)(1)(B).

I would hold that Abercrombie's use of the porch violates each of these provisions. As the preceding discussion indicates, I disagree with the majority's conclusion that "Abercrombie does not 'use' the porch at all." Maj. Op. 27. Abercrombie uses the space as an entrance, customer lounge, and display area, decorated in a fashion calculated to draw customers into the store and strengthen the Hollister brand and image. During the litigation, Abercrombie made much of the fact that the porch was intended as a visual display only, and that the "visual

---

[13] These provisions are limited to discrimination against "clients or customers." 42 U.S.C. § 12182(b)(1)(A)(iv). I would hold that the Plaintiffs have established at the summary judgment stage that Ms. Farrar is a customer.

27

sensory experience of the porch is the same for able-bodied customers and customers who use mobility devices." III Aplt. App. 738, 940–41, 972; see also Aplt. Br. 45–46. Yet when presented with the option of bringing the porch into compliance by closing it off to all customers, Abercrombie submitted a declaration stating that this was the "worst, and least acceptable" of the options presented by the district court because it would "be extremely detrimental to the Company's carefully crafted branding efforts" and would "cause permanent damage to the Hollister brand." III Aplt. App. 1071. Abercrombie's response belies its assertion that the use of the porch as a customer lounge, branding tool, and display area provides merely a visual sensory experience that all customers can enjoy equally, even without access to the porch.

By placing trees, decorations, upholstered chairs, mannequins displaying merchandise, and a large marketing image on the back wall of the porch entrance, Abercrombie has provided a "facility, privilege, advantage, or accommodation" to some of its customers while denying some customers the opportunity to participate on the basis of their disability. 42 U.S.C. § 12182(b)(1)(A)(i).[14] The effect is to create a benefit for some customers that is denied to others on the

---

[14] Subsection 12182(b)(1)(A)(i) provides, "It shall be discriminatory to subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity."

28

basis of disability. By requiring customers who are unable to use stairs to enter

the store through entrances that are not adorned or used even remotely like the

porch entrance, Abercrombie has afforded a "facility . . . or accommodation that

is not equal to that afforded to other individuals," id. § 12182(b)(1)(A)(ii),[15] and

that is "different or separate from that provided to other individuals." Id.

§ 12182(b)(1)(A)(iii).[16] Finally, Abercrombie's use of this exclusive entrance as a

customer lounge, branding tool, and display area, combined with Abercrombie's

provision of segregated, inferior accessible entrances, violates the ADA's

mandate to provide facilities and accommodations "in the most integrated setting

appropriate to the needs of the individual." Id. § 12182(b)(1)(B).[17] The integration

---

[15] Subsection 12182(b)(1)(A)(ii) provides, "It shall be discriminatory to afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals."

[16] Subsection 12182(b)(1)(A)(iii) provides, "It shall be discriminatory to provide an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with a good, service, facility, privilege, advantage, or accommodation that is different or separate from that provided to other individuals, unless such action is necessary to provide the individual or class of individuals with a good, service, facility, privilege, advantage, or accommodation, or other opportunity that is as effective as that provided to others."

[17] Subsection 12182(b)(1)(B) provides, "Goods, services, facilities, privileges, advantages, and accommodations shall be afforded to an individual with a disability in the most integrated setting appropriate to the needs of the individual."

29

mandate "prohibit[s] exclusion and segregation of individuals with disabilities."

28 C.F.R. § 36, App. C, at 901 (agency guidance on Title III's integration

mandate). By excluding customers who use wheelchairs from the porch and

requiring them to use the unadorned, inferior side entrances, Abercrombie

effectively "relegates persons with disabilities to the status of second-class

citizens." See id. Thus, Abercrombie's use of the porch violates Title III of the

ADA.[18]

My conclusion that Abercrombie is in violation of the general provisions of

the ADA reinforces my conclusion that Abercrombie violated the Design

Standards by not connecting the porch to an accessible route. The specific

prohibitions in the ADA must be read in light of the general prohibitions. See

Caruso, 193 F.3d at 739–40. The general prohibitions make clear that the purpose

of the ADA is inclusion of people with disabilities. The porch at the Park

Meadows Hollister sends a message of exclusion. Construing the Design

Standards in a way that allows that result would undermine the stated purpose of

Title III of the ADA.

---

[18] Compliance with the design standards would not have been difficult. In fact, Abercrombie designed some of its stores with the same surf-shack motif, but in an inclusive fashion, by simply constructing the porch at ground level. A picture of a store with that design is attached to this decision as Attachment 2.

In light of the foregoing, I would affirm the district court's entry of summary judgment in favor of the Plaintiffs, and its entry of an injunction relating to the Park Meadows store.[19]

---

[19] Because I would hold that Abercrombie violated the ADA, I would also address an aspect of Abercrombie's appeal unnecessary to the majority's analysis: namely, whether the district court abused its discretion in fashioning the injunctive relief granted. I would hold that where the district court was required to issue an injunction and tailored that injunction to accommodate many of the concerns raised by Abercrombie, the district court did not abuse its discretion.

# ATTACHMENT 1



# ATTACHMENT 2

